**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **ANTHONY SHAFFER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 10-2119 (RMC)** |
| | ) | |
| **DEFENSE INTELLIGENCE AGENCY,** | ) | |
| *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## OPINION

After a career as a military intelligence officer, Anthony Shaffer was employed by the Defense Intelligence Agency while also serving in the Army Reserve as a Lieutenant Colonel. After 9/11, he was sent to Afghanistan for two tours of duty. Upon his return, he wrote a best-selling book, *Operation Dark Heart: Spycraft and Special Ops on the Frontlines of Afghanistan and the Path to Victory* (St. Martin's Press 2010). As required by the secrecy agreements he signed during his career, Lt. Col. Shaffer (Ret.) submitted his manuscript for review before publication. The Army Reserve cleared the manuscript and the publisher printed a first edition. The Defense Intelligence Agency, Department of Defense, and Central Intelligence Agency (Defendants) then obtained a copy of the manuscript and insisted on hundreds of redactions of allegedly classified information. This lawsuit ensued. Lt. Col. Shaffer contends that Defendants violated his First Amendment rights by insisting upon unnecessary redactions, while the Defendants assert their responsibility to protect classified information and Lt. Col. Shaffer's contractual obligation of secrecy.

1

Via this litigation, Defendants slowly and with utmost reluctance were compelled to concede that Lt. Col. Shaffer's testimony before the House Armed Services Committee on February 15, 2006, was officially released and can be published.  As to the remainder of the redacted material, Defendants submitted *in camera* a precise explanation for each.  The Court reviewed all of the material, including Lt. Col. Shaffer's allegation that the narrative of his accomplishments that supported his Bronze Star award was publishable because it had been officially released, and finds that Defendants supported their reasons for non-disclosure. Defendants' motion for summary judgment will be granted in part and denied in part.

## I. FACTS

### A.  Background

Anthony Shaffer retired from the United States Army as a lieutenant colonel and thereafter continued to serve in the Army Reserve.  From 1995 to 2006, Lt. Col. Shaffer worked as a civilian employee of the Defense Intelligence Agency (DIA), within the Department of Defense (DOD), while serving simultaneously in the Army Reserve.  Lt. Col. Shaffer was mobilized as an Army Reserve Officer from December 2001 to June 2004, during which time he served two tours in Afghanistan.  Over the course of his Army career and at DIA, Lt. Col. Shaffer signed several non-disclosure agreements to maintain the secrecy of classified information and documents.  Pursuant to these non-disclosure obligations, Lt. Col. Shaffer must submit any written materials that may contain classified information to the military for prepublication security review.  *See* Mot. for Summ. J. (MSJ) [Dkt. 63], Ex. A (Scheller Decl.) [Dkt. 63-3], Attachments A-G (Nondisclosure Agreements executed by Lt. Col. Shaffer).  He has been assiduous in his compliance.

In early 2007, after he left his position at DIA, Lt. Col. Shaffer teamed with a ghostwriter to write a memoir of his time in Afghanistan, titled *Operation Dark Heart: Spycraft and Special Ops on the Frontlines of Afghanistan and the Path to Victory* (the Book).  The Book was

accepted for publication by Thomas Dunne Books/St. Martin's Press (St. Martin's Press).  Lt. Col.

Shaffer describes *Operation Dark Heart* as:

> a direct, detailed eyewitness account of the 2003 'tipping point' of the
> war in Afghanistan . . . [that] provides an unemotional examination of
> the events and decisions where mistakes were made in strategy[,] . . .
> [and] recommends a detailed, alternate strategy to the current failing
> [c]ounterinsurgency strategy that could result in victory in
> Afghanistan.

Am. Compl. [Dkt. 35]  ¶ 7.  The Book also "details protected disclosures made to the Executive

Director of the 9/11 Commission on pre-9/11 intelligence failures . . . ."  *Id.*

Much of the Book focuses on Lt. Col. Shaffer's career after September 11, 2001.  It

details his tours of duty in Afghanistan, where he participated in such "high risk/high gain

operations" as the search for the senior leadership of Al Qaeda for which he received a Bronze Star.

*Id.* ¶ 2.  The Book also covers Lt. Col Shaffer's involvement in a military intelligence project known

as "Able Danger."  As described in a separate lawsuit brought by Lt. Col. Shaffer, Able Danger

allegedly identified at least one of the September 11 hijackers prior to the attacks.  *See Shaffer v.

Defense Intelligence Agency*, 601 F. Supp. 2d 16, 19-20 (D.D.C. 2009).  Lt. Col. Shaffer writes in

*Operation Dark Heart* that he informed the 9/11 Commission about Able Danger.

Lt. Col. Shaffer first notified his Army Reserve chain-of-command in March 2009

that he was writing a book.  Army Reserve leadership provided guidance on how to comply with all

security and ethical regulations, and he submitted a draft manuscript of the Book to the Army

Reserve chain-of-command in 2009.  For reasons that are not revealed in the record, Lt. Col. Shaffer

did not submit the draft manuscript to DIA or any other component of the DOD.

Two officers in Lt. Col. Shaffer's Army Reserve chain-of-command were appointed

to review *Operation Dark Heart*.  Am. Compl. ¶ 12.  The first, a Staff Judge Advocate for the

Headquarters 94th Training Division, U.S. Army Reserve Center in Fort Lee, Virginia, issued a

memorandum on December 26, 2009, stating that "it was his understanding that [Lt. Col.] Shaffer used only unclassified information and open sources in his memoir." *Id*. ¶ 15. He opined that Lt. Col. Shaffer could accept payment for his memoir. *Id*. The second, an Assistant Division Commander of the Headquarters 94th Training Division issued on January 4, 2010 a favorable security review and approval of the Book for publication. *Id.* ¶ 16.

Lt. Col. Shaffer sent the manuscript to St. Martin's Press for publication in February 2010. However, at some point before the Book's scheduled distribution date of August 31, 2010, DIA obtained a copy of the manuscript, reviewed it, and determined that it "contained a significant amount of classified information," the release of which "would cause harm to the national security of the United States." MSJ at 5. The CIA also reviewed *Operation Dark Heart* and reached the same conclusion. *Id*.

On August 6, 2010, due to the DIA and CIA's objections to publication of allegedly classified material, the Army Reserve revoked its publication approval. Am. Compl. ¶¶ 27-28. Although St. Martin's Press already had printed the Book, it agreed to delay distribution so that classification concerns could be addressed. *Id*. ¶ 30. Consequently, Lt. Col. Shaffer, DIA officials, DOD officials, and agents from St. Martin's Press spent August and September 2010 discussing potential revisions to the manuscript. *Id*. ¶¶ 32, 36. The upshot of these negotiations was a modified manuscript: Lt. Shaffer agreed to the revision of certain passages and the redaction of all text on which the parties could not agree to modifications. *Id*. ¶ 36. At the end of this process, approximately 250 of the Book's 320 pages contained redactions. *Id.* ¶ 37.

On September 24, 2010, St. Martin's Press published the redacted version of *Operation Dark Heart*.[1] *Id.* ¶ 41. By then, however, St. Martin's Press already had sent out a small

---

[1] St. Martin's Press also published a paperback edition of *Operation Dark Heart* in October 2011, which "contained all the redactions in the hard cover version . . . ." Am. Compl. ¶ 49.

number of copies of the original unredacted draft—without redactions of classified material—for pre-distribution critics' review and comment.  DOD allegedly paid St. Martin's Press to destroy all copies from the first printing of the Book, but the publisher was unable to retrieve all of the copies circulated for pre-distribution critical review.  MSJ, Ex. B (Shaffer Decl.) [Dkt. 63-4] ¶¶ 35, 46. Unredacted copies of the first printing of *Operation Dark Heart* began appearing for sale online in September 2010.  *Id.* ¶ 49.  Various media, such as the *New York Times*, started to report on the Book and DOD's efforts to prevent publication of classified information.  *See e.g.*, *id.* ¶ 44 (citing Scott Shane, Secrets in Plain Sight in Censored Book's Reprint, N.Y. Times, Sept. 18, 2010, at A9).  A group focused on national security issues posted a purported side-by-side comparison of the two versions of the Book on its website, thereby claiming to identify the redacted information.  Shaffer Decl. [Dkt. 63-4] ¶ 51.

### B.  Procedural History

On December 14, 2010, Lt. Col. Shaffer filed a Complaint against Defendants, alleging that they deprived him of his First Amendment right to publish by designating as classified a substantial amount of classified information in the Book.  *See* Compl. [Dkt. 1] ¶ 56.  Defendants moved to dismiss for lack of standing, arguing that Lt. Col. Shaffer had transferred all of his rights to the Book to St. Martin's Press, so that only St. Martin's Press could claim a constitutional injury. Judge Ricardo M. Urbina, to whom the case was originally assigned, denied Defendants' motion without prejudice and ordered Lt. Col. Shaffer to amend the Complaint to address the issue of standing.  *See* Jan. 12, 2012 Order [Dkt. 34].

Lt. Col. Shaffer filed an Amended Complaint on February 13, 2012.  In addition to making new allegations regarding standing, he alleged three Counts:

> Count I claims a First Amendment right to publish the information
> redacted from the Book;

> Count II claims a First Amendment right to use a secure government computer for the purpose of challenging Defendants' classification decision; and
>
> Count III claims a First Amendment right to give Plaintiff's counsel access to the allegedly classified information for the purpose of challenging classification.

Am. Compl. ¶¶ 62-90.

Upon Judge Urbina's retirement, the case was reassigned here. Defendants filed a second motion to dismiss, again arguing that Lt. Col. Shaffer lacked standing because he had assigned all rights to St. Martin's Press. *See* Mot. to Dismiss [Dkt. 37]. This Court disagreed. It found that Lt. Col. Shaffer has standing "because he maintains rights to publish an unredacted version of his book and, if the redactions are overbroad, to otherwise 'publish' the non-classified information in his book." *Shaffer v. DIA* (*Shaffer I*), 901 F. Supp. 2d 113, 115 (D.D.C. 2012); *see also* Op. [Dkt. 44].

In the meantime, Lt. Col. Shaffer decided to move forward with a foreign language edition of *Operation Dark Heart*. In anticipation of publishing the foreign language edition, on August 3, 2012, Lt. Col. Shaffer submitted a formal request to the DOD's Office of Security Review (OSR) for another classification review. *See* MSJ, Ex. D (Langerman Decl.)[2] [Dkt. 63-7] ¶ 2. OSR is a component of DOD that "conducts the security and policy reviews for clearance of official Department of Defense (DOD) information proposed for official public release by the DOD and its employees (military and civilian)." Defense Office of Prepublication and Security Review, available at http://www.dtic.mil/whs/esd/osr (last visited March 26, 2015).

On October 17, 2012, OSR and other DOD personnel met with Lt. Col. Shaffer in connection with the re-review of the Book. During that meeting, with the full text of the Book in

---

[2] Mark Langerman is the Chief of the OSR.

front of them, the participants discussed substituting unclassified language to replace various redactions.  They also discussed whether, as asserted by Lt. Col. Shaffer, the Government had officially disclosed some of the redacted information so that it could be printed in the Book. Specifically, Lt. Col. Shaffer contended that these two documents had been officially released: (1) his prepared testimony for the open hearing before the House Armed Services Committee on February 15, 2006 and (2) the Bronze Star narrative, *i.e.*, the text describing Lt. Col. Shaffer's meritorious conduct for which he was awarded the Bronze Star in Afghanistan (Narrative).

As a result of these discussions and the OSR review, the Government determined that information in 198 of the 433 passages redacted in the September 2010 edition were properly declassified.  *See* Langerman Decl., Ex. 6 (Jan. 18, 2013 OSR Letter) at 1.  In addition, Lt. Col. Shaffer agreed to replace 73 passages with OSR's suggested substitute language and to delete 139 passages.  *Id.*  With this accord, only 23 passages remained in dispute.  *Id.*  Lt. Col. Shaffer asserted that the information underlying these 23 passages was available through unclassified, open sources and that the information had been officially released.  These passages contained information from his February 15, 2006 testimony before the House Armed Services Committee and from the Bronze Star Narrative.  OSR agreed to review the open source materials if Lt. Col. Shaffer specifically identified such materials, and to review any evidence Lt. Col. Shaffer submitted regarding his claim that the February 2006 testimony and the Narrative had been officially released.

Lt. Col. Shaffer identified open source material to OSR, but he did not include pinpoint citations to the page numbers where the disclosures in the Book could be located in the open source documents.  On December 19, 2012, OSR told Lt. Col. Shaffer that it could not conduct a meaningful review without the pinpoint citations and requested a supplemental submission. Langerman Decl., Ex. 4 (Dec. 19, 2012 OSR Letter) at 1.  OSR also alerted Lt. Col. Shaffer to the

fact that none of the materials he had submitted addressed whether the Bronze Star Narrative had been officially released. *Id.*[3]

The next day, Lt. Col. Shaffer responded to OSR. He did not provide any pinpoint citations and instead explained that he needed access to an unredacted copy of the Book because he could not recall all of the text that had been redacted. Langerman Decl., Ex. 5 (Dec. 20, 2012 Shaffer Letter) at 1. He also suggested that OSR did not need pinpoint citations because OSR personnel "took detailed notes" during the October 17 meeting and Lt. Col. had "identified . . . the specific text in question and what the public source information was." *Id.* Further, with respect to the Narrative accompanying his Bronze Star award, Lt. Col. Shaffer stated that this document was "given to [him] as part of [his] award," and "was provided to both the United States Senate and House of Representatives as part of the Able Danger congressional hearings held in 2005 and 2006." *Id.*

OSR completed its review of *Operation Dark Heart* and informed Lt. Col. Shaffer of its determinations. *See* Jan. 18, 2013 OSR Letter. In sum, OSR determined that 198 of the 433 passages redacted in the September 2010 edition had "been properly declassified in accordance with Executive Order 13526" and could be published. Jan. 18, 2013 OSR Letter at 1. For the 23 passages that included information alleged to come from open sources, OSR concluded that "none of the source materials show[ed] a relevant official release of any kind." *Id.* at 2. OSR did not find any record indicating that the Bronze Star Narrative document had ever been released officially. *Id.* OSR also indicated that while Lt. Col. Shaffer submitted his "prepared testimony for review prior to testifying in the Able Danger hearings, the testimony was never cleared for public release . . . ."[4] *Id.*;

---

[3] The December 19, 2012 letter from OSR did not refer to the congressional testimony.

[4] The Able Danger hearings included, *inter alia*, a hearing before the Senate Judiciary Committee on *September 20, 2005* and a hearing before the House Armed Services Committee on *February 15, 2006*. Lt. Col. Shaffer does not dispute that the September 2005 proposed testimony was not officially cleared for release. The September 2005 proposed testimony was prepared for Lt. Col. Shaffer's potential testimony before the Senate Judiciary Committee. *See*

Langerman Decl. ¶ 5 (Lt. Col. Shaffer did not "produce a DD Form 1790 signed by an authorized Government official . . .").

The January 18, 2013 OSR determination letter enclosed a spreadsheet explaining which passages of the Book remained classified and which were no longer classified. *See* Jan. 18, 2013 OSR Letter, Attachment. Provided that Lt. Col. Shaffer consented to the redaction of the 23 passages still in dispute, OSR deemed the Book cleared for public release. *Id*. at 2.

On April 26, 2013, Defendants filed a motion for summary judgment, supported by unclassified and classified declarations submitted *ex parte* for *in camera* review. *See* MSJ [Dkt. 63] & Exs. A - J [Dkts. 63-2 – 63-13]; Sealed Ex. [Dkt. 64]; Reply [Dkt. 70]; Notice of Ex Parte Filing [Dkt. 74]; Notice of Lodging [Dkt. 76]. According to Defendants, the redacted information has not been officially disclosed or acknowledged and its release would cause serious harm to the national security of the United States. Lt. Col. Shaffer opposes. *See* Opp'n [Dkt. 69].

On April 9 and 29, 2014, after the summary judgment motion was ripe and a hearing was held, the Court found that the briefing was inadequate as to the classification status of (1) the February 2006 testimony before the House Armed Services Committee and (2) the Bronze Star Narrative. The Court ordered the parties to filed sealed declarations regarding Lt. Col. Shaffer's allegations that these documents were officially released. *See* Scheduling Order [Dkt. 77]; Apr. 29, 2014 Minute Order. The parties have submitted additional declarations and briefs regarding the February 2006 testimony, *see, e.g.*, Zaid Decl. [Dkt. 83]; Supplemental Shaffer Decl. [Dkt. 83-1]; Resp. to Pl. Supplemental Decl. [Dkt. 87]; 2d Langerman Decl. [Dkt.

*Shaffer*, 601 F. Supp. 2d at 21. He submitted it to DOD for classification review, but when DOD failed to respond, his counsel, Mark Zaid, testified in his stead. *Id*.; *see also* Zaid Decl. [Dkt. 83] ¶ 9. OSR failed to search for Lt. Col. Shaffer's prepared testimony to the House Armed Services Committee in February 2006, but as explained below, when Defendants finally investigated they found that the *February 2006* testimony was, in fact, officially released. *See* Resp. to Pl. Supplemental Decl. [Dkt. 87] at 2.

87-1]; Leatherwood Decl. [Dkt. 87-5], and with regard to the Bronze Star Narrative, *see, e.g.*,

Supplemental Shaffer Decl. [Dkt. 83-1]; Olivero Decl. [Dkt. 90-1]; Resp. [Dkt. 92];

Leatherwood Decl. [Dkt. 92-1].

## II. LEGAL STANDARDS

### A.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall

be granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly

granted against a party who "after adequate time for discovery and upon motion . . . fails to make

a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).  In ruling on a motion for summary judgment, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

*Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere

existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  In addition, the

nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*,

164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that

would enable a reasonable jury to find in its favor.  *Id.* at 675.  If the evidence "is merely

colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477

U.S. at 249-50 (citations omitted).

### B.  Review of Government Classification Decisions

The Executive Branch has the authority and responsibility to control classified information, *see Dep't of the Navy v. Eagan*, 484 U.S. 518, 527 (1988), and cannot be compelled to release it, *see Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003); Executive Order 13,526 (published at 75 Fed. Reg. 707 (Dec. 29, 2009)).[5]  The material redacted from *Operation Dark Heart* includes the following five types of classified information:

> (1) military plans, weapons systems, or operations;
>
> (2) foreign government information;
>
> (3) intelligence activities (including covert action), intelligence sources or methods, or cryptology;
>
> (4) foreign relations or foreign activities of the United States, including confidential sources; or
>
> (5) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security. [6]

*See* Executive Order 13,526 § 1.4(a)-(d), (g).

At the outset, it is important to note what is not in dispute.  Lt. Col. Shaffer does not challenge the validity of the non-disclosure agreements he signed and does not present a facial challenge to Defendants' prepublication review process.  He agrees that he is required to submit his writings for prepublication review.  *See* Am. Compl. ¶ 3.  Further, he acknowledges that he has no First Amendment right to publish information that has been properly classified. *See Stillman v CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003) ("If the Government classified the

---

[5] Executive Order 13,526 revoked two predecessors: Executive Order 13,292 and Executive Order 12,958.  *See* EO 13,526 § 6.2(g).

[6] "National security," as defined in § 6.1(cc) of EO 13,526, means "the national defense or foreign relations of the United States."

information properly, then [an individual] simply as no first amendment right to publish it.")
However, Lt. Col. Shaffer alleges that Defendants violated his First Amendment rights in three
ways: (1) by prohibiting publication of unclassified information; (2) by denying Lt. Col. Shaffer
access to a secure computer for the purpose of challenging Defendants' classification
determinations; and (3) by disallowing his counsel access to classified information allegedly
necessary to counsel's representation.  Am. Compl., Counts I-III.

   The law in this Circuit is clear:  current and former government employees have
no First Amendment right to publish properly classified information to which they gained access
by virtue of their employment.  *McGehee v. Casey*, 718 F.2d 1137, 1143 (D.C. Cir. 1983); *see
also Stillman*, 319 F.3d at 548 (when the Government has properly classified information, there
is no First Amendment right to publish it).  The Government has a compelling interest in
protecting the secrecy of information important to national security, and censorship of classified
information protects this substantial interest.  *McGehee*, 718 F.2d at 1143 (citing *Brown v.
Glines*, 444 U.S. 348, 354 (1980); *Snepp v. United States*, 444 U.S. 507, 510 n.3 (1980)).

   Nonetheless, when a manuscript contains information that is unclassified,
wrongly-classified, or derived from public sources, the Government may not censor such
material.  *Id*. at 1141.  Further, classified information may be disclosed over Government
objection if the information has been "officially acknowledged," that is, if (1) the same,
(2) specific information (3) already has been "made public through an official and documented
disclosure."  *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990) (citing *Afshar v. Dep't of
State*, 702 F.2d 1125, 1133 (D.C. Cir. 1983)).  "These criteria are important because they
acknowledge the fact that in the arena of intelligence and foreign relations there can be a critical
difference between official and unofficial disclosures."  *Id*.

A plaintiff asserting a claim of prior disclosure bears the "initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Afshar*, 702 F.2d at 1130.  Merely pointing to public sources, however, is insufficient.  "[T]he fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods and operations." *Fitzgibbon*, 911 F.2d at 766; *see also id*. at 765 (quoting *Alfred A. Knopf, Inc. v. Colby,* 509 F.2d 1362, 1370 (4th Cir. 1975) ("It is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so."); Executive Order 13,526 § 1.1(c) ("Classified information shall not be declassified automatically as a result of any unauthorized disclosure of identical or similar information.").[7]

In *Stillman*, the D.C. Circuit established a two-step process for analyzing challenges to Government censorship of classified information::

> The district court should first inspect the manuscript and consider any pleadings and declarations filed by the Government, as well as any materials filed by [plaintiff] . . . . *The court should then determine whether it can*, consistent with the protection of [plaintiff's] first amendment rights to speak and to publish, and with the appropriate degree of deference owed to the Executive Branch concerning classification decisions, *resolve the classification issue without the assistance of plaintiff's counsel*. If not, then the court should consider whether its need for such assistance outweighs the concomitant intrusion upon the Government's interest in national security. Only then should it decide whether to enter an order granting [counsel] access to the manuscript and, if similarly necessary, to the Government's classified pleadings and affidavits. If the court enters such an order, then the Government may appeal and we will have to resolve the constitutional question.

---

[7] Thus, the fact that one or more copies of the unredacted Book (released by the publisher in 2010 for critical review before distribution) may be available for purchase on the Internet is immaterial to the Court's analysis.

*Id*. at 548-49 (emphasis added).  In other words, a district court must first attempt to resolve a classification challenge *ex parte* and *before* reaching any associated constitutional questions, such as whether the author has a First Amendment right to publish classified information or whether his counsel must be provided access to classified information so that he can ably assist in pursuit of the author's First Amendment rights.  *Id.*

Generally, courts afford deference to Executive Branch classification decisions, *see, e.g.*, *Salisbury v. United States*, 690 F.2d 966, 973 (D.C. Cir. 1982), because the Executive Branch generally is better positioned than the Judiciary to assess the need to classify certain information.  "Due to the mosaic-like nature of intelligence gathering, what may seem trivial to the uniformed may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in context."  *McGehee*, 718 F.2d at 1149 (internal quotations and citations omitted).  In prepublication review cases, however, courts must review the Government's classification decision *de novo*.  *McGehee*, 718 F.2d at 1148.  Prepublication review cases involve plaintiffs, like Lt. Col. Shaffer, who wish to publish information that they already possess.  Such plaintiffs have a strong First Amendment interest in ensuring that Government censorship results from a *proper* classification of the censored portions.[8]  *Id.* (emphasis added).  Accordingly, the D.C. Circuit established a *de novo* review standard, giving deference to reasoned and detailed Government explanations of the classification decision.  *Id.*

Courts must defer to the Government's judgment as to the harmful results of publication, but "they must nevertheless satisfy themselves from the record, *in camera* or

---

[8] Because prepublication review implicates First Amendment rights, the standard of review is higher than the standard applied in cases filed under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, where a plaintiff is merely seeking access to records pursuant to a statutory entitlement.  *See McGehee*, 718 F.2d at 1148 (citing *Gardels v. CIA*, 689 F.2d 1100, 1104-05 (D.C. Cir. 1982)).

otherwise, that the [Government] in fact had good reason to classify, and therefore censor, the materials at issue." *Id.* at 1148. In such circumstances, there is no "presumption of regularity" without "rational explanations." Courts must require that the Government "justify censorship with reasonable specificity, demonstrating a logical connection between the detailed information and the reasons for classification." *Id.* at 1148-49.

### III. ANALYSIS

As to the first approved printing of *Operation Dark Heart*, the parties agreed in September 2010 to the revision of certain passages and the redaction of all text on which the parties could not agree to modifications, resulting in redactions from approximately 250 pages. Am. Compl. ¶¶ 36-37. On September 24, 2010, St. Martin's Press published this redacted version. *Id.* ¶ 41. Upon re-review, the parties agreed in October 2012 to redact 212 passages. *See* Jan. 18, 2013 OSR Letter at 1. After the October 2012 agreement, only 23 passages remained in dispute—passages that included material from Lt. Col. Shaffer's February 2006 testimony before the House Armed Services Committee and material from the Narrative that accompanied his Bronze Star.

### A. February 2006 Congressional Testimony

Lt. Col. Shaffer filed a Declaration on June 6, 2014, describing the preparation of testimony for both unclassified and classified hearings before the House Armed Service Committee and the official release of an unclassified version of the testimony. *See* Supplemental Shaffer Decl. [Dkt. 83-1] ¶ 13. His TS/SCI[9] clearance was temporarily reinstated for a two week period starting February 6, 2006 through the date of his testimony on February 15, 2006, so that he could prepare his testimony on a TS/SCI computer at the DIA facility in Clarendon, Virginia. *Id.* ¶ 14-15. Salvatore Fierro, an official with the DIA Office of Congressional and Public

---

[9] TS/SCI stands for Top Secret/Sensitive Compartmented Information.

Affairs, was the liaison between Lt. Col. Shaffer and DIA.  *Id.* ¶ 15.  On February 10, 2006, Lt.

Col. Shaffer provided DIA officials a single version of his proposed testimony for classification

review.  *Id.* ¶¶ 16, 18.

On February 15, 2006, Mr. Fierro gave the prepared testimony back to Lt. Col.

Shaffer at the Rayburn House Office Building on Capitol Hill.  As a result of the classification

review, DOD split the testimony into two versions: one was an unclassified/cleared copy that Lt.

Col. Shaffer could use in the open congressional hearing and the other was a Top Secret version

to be used in the closed congressional hearing.  *Id.* ¶ 19.  Mr. Fierro provided the unclassified,

cleared copy to Lt. Col. Shaffer in the presence of his attorney, Mr. Zaid.  *See* Zaid Decl. [Dkt.

83] ¶ 11.

Based on these Declarations, Defendants finally agreed that the February 2006

testimony before the House Armed Services Committee was authorized, was "publicly released

through an official and documented disclosure," and could be published by Lt. Col. Shaffer in

the Book.  *See* Resp. to Pl. Supplemental Decl. [Dkt. 87] at 2.  Defendants contacted Mr. Fierro,

who is now retired, to confirm the official release of the 2006 testimony.  *See* 2d Langerman

Decl. [Dkt. 87-1] ¶ 10.  Because the February 2006 congressional testimony has been made

public through an official disclosure, Lt. Col. Shaffer may include it in his Book.  *See*

*Fitzgibbon*, 911 F.2d at 765.

Defendants did not concede official release of the February 2006 congressional

testimony until August 8, 2014, when they filed their Response to Plaintiff's Supplemental

Declarations, Dkt. 87.  Defendants explain their sudden turn-around by stating that (1) Lt. Col.

Shaffer bore the burden of proving official release and (2) it was not until the June 2014 filing of

Lt. Col. Shaffer and Mr. Zaid's Declarations that Defendants finally had the critical information

they needed—the name of the DIA official (Mr. Fierro) who handled the release of the February

2006 congressional testimony.  *See* 2d Langerman Decl. [Dkt. 87-1] ¶ 9.  Mr. Fierro, who

worked in the DIA Office of Congressional and Public Affairs, released the 2006 testimony

without the knowledge of the DIA Directorate of Operations.  *See* Leatherwood Decl. [Dkt. 87-

5].[10]  Defendants were able to confirm official release by contacting Mr. Fierro.  *See* 2d

Langerman Decl. [Dkt. 87-1] ¶ 10.

Defendants' excessive delay in confirming official release is not excused.  Lt.

Col. Shaffer long ago provided significant information that should have allowed Defendants to

confirm official release of the February 2006 testimony.  On March 22, 2013, over a month

before Defendants filed their motion for summary judgment on April 26, 2013, Lt. Col. Shaffer

described the fact that DOD cleared his testimony before Congress in February 2006 and he

provided to Defendants links to webpages that included the cleared testimony as well as the

transcript of the congressional hearing.  *See* Shaffer Decl. [Dkt. 63-4] ¶ 71 (citing

http://www.abledangerblog.com/2006/03/lt-col-shaffers-written-testimony.html and

http:/www.abledangerblog.com/hearing.pdf).  Lt. Col. Shaffer did not have access to records of the

official release or to DOD employees involved in making the release decision, but Defendants

clearly did.  They had access to the relevant files, officials, and former officials and they did

*nothing* to locate individuals with knowledge of the key facts.  Defendants' blinkered approach

to the serious First Amendment questions raised here caused Defendants to take an erroneous

legal position on classification, wasting substantial time and resources of the parties and the

Court.

---

[10] David Leatherwood is the Director for the DIA Directorate for Operations.

Defendants now concede that the information has been released officially, it cannot be censored, and it can be published.  As a result, Lt. Col. Shaffer's First Amendment claim of a right to publish his February 2006 congressional testimony is vindicated.  Because it was this litigation that compelled Defendants to investigate and confirm official release, Lt. Col. Shaffer is the prevailing party on this issue.[11]  Summary judgment will be entered on this point in favor of Lt. Col. Shaffer.

### B.  Bronze Star Narrative

With regard to the Bronze Star Narrative, Lt. Col. Shaffer contends that he can publish information from the Narrative because it was declassified after review by the Army chain of command.  *See* Supplemental Shaffer Decl. [Dkt. 83-1] ¶¶ 7, 9.  Defendants insist that the Narrative is classified and has never been officially released.  While Defendants seek summary judgment, Lt. Col. Shaffer contends that there is a genuine issue of material fact regarding whether the Narrative was officially released.

Lt. Col. Shaffer submitted his own declaration as well as the declaration of Special Forces Col. (ret.) Jose Olivero, who nominated him for the Bronze Star.[12]  *See* Supplemental Shaffer Decl. [Dkt. 83-1]; Olivero Decl. [Dkt. 90-1].  Col. Olivero described the background to his October 2003 nomination of Lt. Col. Shaffer for the Bronze Star.  Major Rich Milner, Lt. Col. Shaffer's direct command officer, provided details of Lt. Col. Shaffer's accomplishments to Major Tim Loudermilk.  Olivero Decl. [Dkt. 90-1] ¶ 4.  Major Loudermilk

---

[11] As a prevailing party, Lt. Col. Shaffer may proceed on a claim for attorney fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412.

[12] Col. Olivero is a West Point graduate who served 27 years in the Army before his retirement as a Colonel of Special Forces in December 2005.  Olivero Decl. ¶ 2.  Col. Olivero continues to work for the Department of the Army as a civilian.  *Id.*

put together an "award packet," not further described, that Col. Olivero signed and forwarded to

headquarters for endorsement. *Id*. The packet was approved by Brigadier General (now full

General) Lloyd Austin, Commanding Officer, Combined Joint Intelligence Task Force (CJTF)

180. *Id*. Upon approval, Col. Olivero presented the Bronze Star on Lt. Col. Shaffer in a small

ceremony at Bagram Air Base, Afghanistan in November 2003. *Id*.

        Lt. Col. Shaffer contends that after the ceremony, the Bronze Star certificate and

supporting Narrative underwent a classification review. *See* Supplemental Shaffer Decl. [Dkt.

83-1] ¶ 7. He asserts that the Narrative was officially released when, in May 2004 at the Joint

Field Support Center, the Army returned a packet of documents to Lt. Col. Shaffer including a

new Bronze Star certificate, a redacted version of the Narrative, and the medal itself. *See id*. ¶¶

7, 9. Lt. Col. Shaffer included information from the unredacted Narrative in his Book.

        Defendants agree that the Bronze Star itself and the certificate that accompanies it

are unclassified, but they point out that the unredacted Narrative includes different text from the

certificate and they assert that it "contains national security information that was then, and

remains now, properly classified." *See* Leatherwood Decl. [Dkt. 92-1] ¶ 5;[13] *see also id*.,

Attachment (unredacted certificate).

        Col. Olivero's Declaration describes the creation of the Narrative, the approval of

the award, and the ceremony at which the award was presented at Bagram Air Base, but it does

not describe an official release of the Narrative to anyone outside DOD.[14] Lt. Col. Shaffer's

---

[13] David G. Leatherwood is DIA's Director for Operations.

[14] Although Col. Olivero states that he never understood the "award" or the "documents
discussing the award" to be classified in the first place, he does not actually opine as to the
"narrative." Olivero Decl. [Dkt. 90-1] ¶ 5. Further, Col. Olivero does not have, or purport to
have, authority to make classification determinations, and his personal opinion regarding
whether information is or was classified is not controlling. *See Gardels v. CIA*, 689 F.2d 1100,
1106 n.5 (D.C. Cir. 1982) (former CIA employee's personal opinion did not undermine the

Declaration fails to provide evidence that the Narrative was officially released.  In fact, he

concedes that after Army review, he received only a *redacted* copy of the Narrative.  *See*

Supplemental Shaffer Decl. [Dkt. 83-1] ¶ 9.  Further, his allegation that he was given a copy of

the Narrative at a government facility in May 2004, *see id*. ¶¶ 7, 9, does not constitute evidence

of official release to the public.  When Lt. Col. Shaffer received the Narrative, he had appropriate

clearance, he already knew the information in the Narrative, and he was required by contract not

to publish it without prepublication review.

Lt. Col. Shaffer has not identified information in the public domain that duplicates

the censored information from his Bronze Star Narrative, and he has not pointed to evidence

supporting his claim that the Narrative itself has been officially released.  While there is no doubt

that he understood the Army's full review to provide that result, his evidence fails to answer Mr.

Leatherwood's Declaration.  The Narrative remains classified.

### C.  Remaining Redactions

Despite the parties' September 2010 agreement that the first edition of the Book

could be published with agreed revisions and redactions, *see* Am. Compl. ¶¶ 36-37, 41, and their

October 2012 agreement that the foreign language edition could be published with agreed redactions,

*see* Jan. 18, 2013 OSR Letter at 1, Lt. Col. Shaffer continues to assert his right to publish a full

unredacted version of *Operation Dark Heart*.  *See* Opp'n [Dkt. 69]; Statement of Facts in Dispute

[Dkt. 69-3] ¶ 14; *see also* Am. Compl. ¶ 37 (disputes *all* redactions from the Book).

---

Government showing that the information was classified); *Halperin v. Nat'l Sec. Council*, 452 F.
Supp. 47, 51 (D.D.C. 1978) (nothing in the record justified "the substitution of the Court's
judgment or the informed judgment of the [p]laintiff for that of the officials constitutionally
responsible for the conduct of United States foreign policy as to the proper classification of [the
documents].")  Notably, Lt. Col. Shaffer does not contend that Narrative was never classified.
He argues only that it was officially released.

As mandated by *Stillman*, 319 F.3d at 548, the Court reviewed all of Defendants' redactions from the Book *ex parte*.  Based on the entire record including the *in camera* submissions of *Operation Dark Heart* (in full and in redacted form), classified Declarations, and a passage-by-passage explanation of the bases for classification,[15] the Court finds that the passages redacted from *Operation Dark Heart* (other than those concerning Lt. Col. Shaffer's February 2006 congressional testimony) constitute classified material and Defendants have presented "reasonably convincing and detailed evidence of a serious risk that intelligence sources and methods would be compromised" if the redacted information were published.  *McGehee*, 718 F.2d at 1149.  Defendants were able to show, with reasonable specificity, the connection between the information redacted and their reasons for classification.  Because the Court has been able to resolve the classification challenge *ex parte*, it does not reach the First Amendment issues raised in the Amended Complaint—whether Lt. Col. Shaffer has a First Amendment right to publish classified information, whether he should be provided access to the classified portions of his Book, and whether his counsel should be provided access to classified information.[16]  *See Stillman*, 319 F.3d at 548 (if a court cannot decide whether the information is properly classified

---

[15] *See* MSJ, Exs. A-J [Dkt. 63-2 – 63-13] (Unclassified Decls., Classified Decls., Table of Classified Material Redacted from Manuscript); Sealed Ex. [Dkt. 64] (notice of filing unredacted Book); Notice of Ex Parte Filing [Dkt. 74] (notice of filing redacted Book with classified passages highlighted; Notice of Lodging [Dkt. 76] (classified declarations).

[16] With regard to the issue of counsel access, Lt. Col. Shaffer claims that both of his counsel, Mark Zaid and Bradley Moss, hold valid and current Secret security clearances entitling them to review the classified material at issue here.  *See* Am. Compl. ¶ 83.  This is not entirely accurate. When representing other clients, Plaintiff's attorneys have been given temporary clearance for the purpose of reviewing specific information related to those cases, but no clearance was provided for this case.  Elsewhere in his Amended Complaint, Plaintiff concedes this fact.  *See id.* ¶ 58 ("[B]oth of Shaffer's counsel[ ] hold active Secret security clearances, although not for this specific case.")  Counsel clearance was not necessary in this case because the Court was able to resolve the challenge to the Government's classification decision based on *ex parte in camera* submissions of classified information, as required by *Stillman*, 319 F.3d at 548.

on an *ex parte* basis, only then should the court decide whether to grant access to the manuscript and, if necessary, to the Government's classified pleadings and affidavits).

## IV. CONCLUSION

This litigation has been long and arduous.  It was extended unnecessarily by Defendants' failure to locate Government officials with knowledge of the official release of the February 2006 prepared testimony before the House Armed Services Committee.  Despite the Court's dismay at the waste of its time and the litigants' money and energy, Defendants have finally acknowledged that the February 2006 testimony was officially released.  Because it was this litigation that compelled Defendants to concede official release, Lt. Col. Shaffer is the prevailing party on this issue.  With regard to all other redactions from the Book, the Court concludes that Defendants have provided sufficient evidence that that the information redacted is properly classified and has not been officially released, and Lt. Col. Shaffer has failed to demonstrate a genuine issue of material fact otherwise.

For the foregoing reasons, Defendants' Second Motion for Summary Judgment [Dkt. 63] will be granted in part and denied in part.  Judgment will be entered in favor of Lt. Col. Shaffer with regard to his claim of a right to publish information from his February 15, 2006 testimony before the House Armed Services Committee.  On all other issues, judgment will be entered in favor of the Defendants.  A memorializing Order accompanies this Opinion.

Date:  March 26, 2015

_____/s/_____
ROSEMARY M. COLLYER
U.S. District Judge, Washington D.C.